**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| ROGER W. MILLER, | : | |
| Plaintiff, | : | CIVIL ACTION NO. 3:10CV00473 |
| v. | : | JUDGE JAMES G. CARR |
| WHIRLPOOL CORPORATION | : | |
| Defendant. | : | |

---

# PLAINTIFF ROGER W. MILLER'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---


John S. Marshall (0015160)
(*jmarshall@marshallandmorrow.com*)
Edward R. Forman (0076651)
(*eforman@marshallandmorrow.com*)
MARSHALL AND MORROW LLC
111 West Rich Street, Suite 430
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

**OF COUNSEL:**

Louis A. Jacobs (002101)
(*LAJOhio@aol.com*)
66871 Rayo del Sol
Desert Hot Springs, California, 92240-1871
(614) 203-1255
Fax (760) 288-2146

Laren E. Knoll (0070594)
(*lknoll@knolllaw.com*)
The Knoll Law Firm, LLC
5238 Bethel Reed Park
Columbus, Ohio, 43220
(614) 372-8890
Fax (614) 327-7219

Attorneys for Plaintiff

William J. Shin (0075465)
(*WShin@littler.com*)
Littler Mendelson
321 North Clark Street
Suite 1000
Chicago, Illinois, 60654
(312) 372-5520
Fax (312) 372-7880

Michael W. Jackson (0076344)
(*mjackson@anspachlaw.com*)
Anspach Meeks Ellenberger, LLP
300 Madison Avenue
Suite 1600
Toledo, Ohio, 43604
(419) 246-5757
Fax (419) 321-6979

Attorneys for Defendant

# TABLE OF CONTENTS


PAGE

I. Issue Presented .......... 1

II. Summary Of Argument .......... 1

III. Facts .......... 2

A. Whirlpool Institutes A Fitness-For-Duty Policy Which Includes A Medical Questionnaire .......... 3

B. Mr. Miller Refuses To Complete The Medical Examination Form And Is Terminated .......... 4

C. The Medical Examination/Fit-For-Duty Questionnaire .......... 6

IV. Argument .......... 8

A. The ADA Prohibits Inquiries Regardless Of The Employee's Actual Or Perceived Disability .......... 9

B. To Comply With The ADA Inquiries Must Be Job-Related And Justified By Business Necessity .......... 9

1. Whirlpool's Questionnaire Constituted An ADA Inquiry .......... 13

2. Job-Relatedness Is Proven By A Direct Connection, Rather Than An Attenuated Link, To Essential Functions. .......... 14

3. Business Necessity Is Demonstrated Only When An Employer Uses Narrowly Tailored Inquiries. .......... 15

V. Conclusion .......... 20

Certificate of Service .......... 21

Certificate Of Track And Page Limitations .......... 21

# TABLE OF AUTHORITIES

**PAGE**

**Case Law**


*Conroy v. New York State Dep't of Correctional Services*
333 F.3d 88 (2nd Cir., 2003)........ 8, 9, 11, 13, 14, 16

*Lee v. City of Columbus* (Unreported)
Case Number 09-3899 (6th Cir. 2011)........ 9, 11, 13, 14, 15

*Harrison v. Benchmark Elecs. Huntsville, Inc.*
593 F.3d 1206, 1214 (11th Cir., 2010)........ 9

*Thomas v. Corwin*
483 F.3d 516, 527 (8th Cir. 2007) ........ 9, 16

*Roe v. Cheyenne Mountain Conf. Resort, Inc.*
124 F.3d 1221, 1229 (10th Cir. 1997) ........ 9, 13

*Sullivan v. River Valley School Dist.*
197 F.3d 804, 812 (6th Cir. 1999) ........ 10, 11

*Farmiloe v. Ford Motor Co.*
277 F.Supp.2d 778, 782 (N.D.Ohio 2002)........ 10

*EEOC v. Prevo's Family Market, Inc.*
135 F.3d 1089, 1094 (6th Cir. 1998) ........ 10, 12

*Denman v. Davey Tree Expert Co.*
266 Fed.Appx. 377, 379 (6th Cir., 2007)........ 11, 12, 15

*Kennedy v. Superior Printing Co.*
215 F.3d 650, 656 (6th Cir., 2000) ........ 11, 12

*Terry v. Ohio*
392 U.S.1, 20 (1968)........ 13

*Graham v. Connor*
490 U.S. 386, 396 (1989)........ 13

*Doe v. U.S. Postal Service*
317 F.3d 339, 358-59 (D.C. Cir., 2003)........ 13

*Scott v. Napolitano*
717 F.Supp.3d 1071, 1084-85 (S.D. Cal., 2010) ........ 13, 17, 18

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*
514 U.S. 645, 655 (1995)........ 14, 15

*Smith v. City of Jackson, Miss*
544 U.S. 228, 243 (2005)........ 16

# TABLE OF AUTHORITIES

**PAGE**

## Case Law

*Cripe v. City of San Jose*
261 F.3d 877, 890 (9th Cir., 2001) .................................................. 16

*El v. S.E. Pa. Transp. Auth.*
479 F.3d 232, 242 (3rd Cir., 2007) .................................................. 16

*Hamer v. City of Atlanta*
872 F.2d 1521, 1535 (11th Cir., 1989) .................................................. 16

*Rohr v. Salt River Project Agricultural Imp. And Power Dist.*
555 F.3d 850, 862 (9th Cir., 2009) .................................................. 18

*EEOC v. Murray, Inc.*
175 F.Supp.1053, 1066 (M.D. Tenn., 2001).................................................. 18, 19

## Rules, Statutes, and Other Authorities

Rule 56, Federal Rules of Civil Procedure .................................................. 1

42 U.S.C. §12112(d)(4)(A).................................................. 1, 2, 8, 9, 15

29 C.F.R. §1630.14(c).................................................. 10, 12

29 C.F.R. §1630.15(e).................................................. 18

EEOC Compliance Manual, §902:0187-88.................................................. 17

29 U.S.C. §654(a)(1) .................................................. 19

**PLAINTIFF ROGER W. MILLER'S MOTION**
**FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Roger W. Miller, by and through undersigned counsel, hereby moves the Court, pursuant to Fed.R.Civ.P. 56, for partial summary judgment because there are no genuine issues of material fact and he is entitled as a matter of law to judgment that Defendant Whirlpool Corporation's broad questionnaire to numerous employees about their health conditions violated the Americans with Disabilities Act, 42 U.S.C. §12112(d)(4)(A).

**MEMORANDUM IN SUPPORT OF PLAINTIFF ROGER W. MILLER'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. ISSUE PRESENTED

Whether Defendant's broad questionnaire to numerous employees violated the Americans with Disabilities Act, 42 U.S.C. §12112(d)(4)(A) as a matter of law?

## II. SUMMARY OF ARGUMENT

The Americans with Disabilities Act (ADA) provides in relevant part:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. §12112(d)(4)(A). Whirlpool made exceedingly broad inquiries of all employees who operated powered industrial vehicles, and those inquiries unavoidably sought disclosure of whether they had a disability and its nature or severity.

Whirlpool had previously permitted employees to operate powered industrial vehicles if they passed vision and driving tests. Mr. Miller passed the vision test, which he took without invoking 42 U.S.C. §12112(d)(4)(A), and driving test as required.

Mr. Miller appears to be the only employee who invoked his right under the ADA not to

be subjected to overbroad inquiries[1], and he was discharged after he opposed Whirlpool's inquiries, filed a charge with the Equal Employment Opportunity Commission (EEOC) over the questionnaire, and refused to answer the unlawful questionnaire.

Whirlpool did not make its inquiries based on any individualized suspicion that Mr. Miller was unable to perform the essential functions of his job duties. Whirlpool has suggested that the Occupational Safety and Health Administration (OSHA) approved its questionnaire; however, OSHA is not empowered to, nor was it likely to, construe the ADA or immunize violations of 42 U.S.C. §12112(d)(4)(A), and approval sharply differs from OSHA requiring that Whirlpool administer an overbroad questionnaire.

Whirlpool could readily have made a narrow and specific job-related inquiry of its employees had it sought more information about their ability to perform those job duties than it already had from its vision and driving tests, observation of their performance, and accident reports. Not only were many of its inquiries unrelated to job performance, but they were also unjustified by business necessity.

A critical component of business necessity is using narrowly tailored means to serve the employer's job-related needs. Whirlpool's overbroad inquiries were the broadest means to determine whether employees who had been competently operating powered industrial vehicles could continue to do so.

## III. FACTS

Plaintiff Roger W. Miller ("Mr. Miller") was employed by Defendant Whirlpool Corporation ("Whirlpool") as a Toolmaker from January 15, 2001, until his discharge on February 15, 2009. Answer at 8, Affidavit of Marc Schulz, attached as Exhibit B, at 6. During

[1] According to defendant's response to plaintiff's interrogatory responses, two other employees expressed their feelings that the questionnaire "asked more questions than was necessary," but completed the questionnaire when it

his employment with Whirlpool, Mr. Miller spent virtually all of his time repairing machinery and dies. In the performance of his duties, Mr. Miller was required to regularly use a Powered Industrial Vehicle ("PIV") to drive throughout its facility. Answer at 11. Specifically, Mr. Miller was required to drive an Electric Cart, which is considered a PIV under Whirlpool's Powered Industrial Vehicle Policy and Procedure, attached as Exhibit C.[2] As can be seen from the Electric Cart Safety Guide, attached as Exhibit D, it closely resembles a golf cart.[3]

### A. Whirlpool Institutes a Fitness-For-Duty Policy Which Includes a Medical Questionnaire.

In or about July of 2008, Whirlpool adopted a policy by which employees who operated PIV's, including electric carts, were required to undergo a certification process to determine their ability to safely do so. Answer at 14. The policy required each employee to pass a written test, pass a driving test, and to complete a Medical Certification/Fit-For-Duty questionnaire form. Answer at 15. This form was provided to the employee either by the health center or by the employee's supervisor. Affidavit of Jennifer Lenhart, attached as Exhibit E, at 1-3. Employees were required to return the completed form to the Health Center and were informed of a deadline to do so. *Id*. at 3-4. A copy of the Medical Examination/Fit-For-Duty form is attached to this Memorandum as Exhibit F.[4]

Whirlpool's process, which included the Medical Examination form, was not specific to Mr. Miller. In response to Plaintiff's Interrogatories, defendant stated that "[n]o employee whose job requires the ability to drive a PIV has been exempted from answering the Medical

---

was explained to them that the test was a job requirement and necessary to assess the employee's ability to drive a PIV safely." Defendant's Response to Plaintiff's Interrogatories, attached as Exhibit A, No. 10.

[2] PIV's are defined by the Policy and Procedure as "any vehicle which is mobile, power propelled and is used to carry, push, pull, lift, stack or tier materials. This includes, but is not limited to: forklifts/fork trucks of any kind, articulating or scissors lists, ***golf carts***, motorized pallet jacks, tugger trucks etc." *Id*. (emphasis added).

[3] This Exhibit and all other document exhibits were either provided by defendant in discovery or manifest characteristics which reflect their authenticity.

[4] Whirlpool attached a true and accurate form to their Answer as Exhibit A, and verified it as such in its Answer at 18.

Examination/Fit-For-Duty questionnaire" and that it continues to require its PIV drivers to complete the entire questionnaire. Defendant's Response to Plaintiff's Interrogatories, attached as Exhibit A, Nos. 8 and 11.

In its Answer, Whirlpool stated that it lacks knowledge or information that Mr. Miller ever operated a PIV in an unsafe manner. Answer at 12. Plaintiff's Interrogatory No. 2, asked Whirlpool to state whether it had any suspicion that plaintiff ever operated a PIV in an unsafe, improper and/or questionable manner, and the material facts supporting this suspicion. Whirlpool responded that its only "suspicion" about Mr. Miller's operation was based on "his persistent refusal to complete Defendant's Medical Examination/Fit-For-Duty questionnaire." Defendant's Response to Interrogatory No. 2.

When asked to state if it suspected that plaintiff could not perform his job duties and the supporting material facts, Whirlpool answered only that "Plaintiff failed to perform his job duties within defendant's reasonable expectation in that he refused to complete Defendant's Medical Examination/Fit-For-Duty questionnaire which was a job requirement for all PIV drivers." Defendant's Response to Interrogatory No. 3.

### B. Mr. Miller Refuses to Complete the Medical Examination Form and is Terminated.

Mr. Miller passed both the written and driving tests which were required by the certification process. Complaint at 15, 17, Answer at 15, 17. His December 5, 2008 Cart Operator Proficiency Evaluation, attached as Exhibit G, states that he demonstrated driving proficiency in 12 separate categories. Mr. Miller objected, however, to completing the Medical Examination form.

The deadline for employees such as Mr. Miller to become certified was originally set for December 1, 2008, and was later extended to January 1, 2009. Affidavit of Alan Ahle, attached

as Exhibit H, at 2-3. According to Whirlpool's Value Stream Manager Alan Ahle, as of January 26, 2009, Mr. Miller had "not gotten himself certified to drive a PIV." *Id.* at 1, 4. On that date, Ahle approached Mr. Miller and asked him whether he had gotten certified. *Id*. at 5. Mr. Miller informed Mr. Ahle that he had not. *Id*.

Mr. Ahle told Mr. Miller that he was giving him a deadline of January 30, 2009 to obtain his certification. *Id*. Mr. Miller told Ahle that he was waiting on advice from the "labor board" and that he did not think he could certify by that Friday. Mr. Ahle told Mr. Miller that he had had over three months to certify, and that he needed to be certified by 3:00 on January 30, 2009. *Id*. at 6.

At some point in late January, 2009, Mr. Ahle informed Whirlpool's Human Resources Generalist Marc Schulz that Mr. Miller was refusing to become certified to drive a PIV. Schulz Affidavit at 1, 4. On January 29, 2009, Mr. Miller came to Mr. Ahle and told him that he would box up his tools if Whirlpool would not change its certification policy. *Id*. at 6. Mr. Ahle told Mr. Miller that he wished he would reconsider and simply get himself certified. *Id*. Mr. Miller refused. *Id*. On January 30, 2009, Mr. Miller was brought to Mr. Ahle's office and Mr. Ahle asked him if he had completed his certification. *Id*. at 6. Mr. Miller said he had not, and Mr. Ahle told him that he was suspended pending review for failing to certify as directed. *Id*.

Mr. Schulz then met with Mr. Ahle and Mr. Frisch, and the three of them agreed that Mr. Miller would be "terminated for refusing to get certified." Shulz Aff. at 5. On February 13, 2009, Mr. Miller had a meeting with Mr. Ahle and Mr. Schulz. Mr. Miller was again asked to certify and he refused. *Id*. at 6. Mr. Schulz then informed Mr. Miller that he was terminated for his refusal to certify. *Id*. at 6. In its interrogatory responses, Whirlpool stated that Bill Townsend, Whirlpool's Human Resources Director, "ultimately approved the decision to

terminate plaintiff and was aware at the time that plaintiff objected to completing the Medical Examination/Fit-For-Duty questionnaire." Defendant's Response to plaintiff's Interrogatories No. 13.

### C. The Medical Examination/Fit-For-Duty Questionnaire

As can be seen, the Fitness for Duty form requires an employee to fill out a "health history." The form sets forth 34 questions in which an employee is asked if they have a history of various health conditions. The form goes on to state that "[f]or any YES answer, indicate onset date, diagnosis, treating physician's name and address and any current limitation" (emphasis original). Employees are also required to list all medications (including over-the-counter medications) used "regularly or recently." In the event that the space provided is not enough, employees are directed to use the reverse side of the form for additional information. According to the form itself, any material falsification of fact is *grounds for discharge*. Exhibit F (emphasis added).

The most critical of the 34 inquiries is the first, which requires the employee to disclose:

"***Any illness, injury or past accidents****?*"

By the plain language of the form employees are required to reveal their entire medical history, along with the onset date, diagnosis, treating physician and the undefined concept of "current limitation." This would be in *addition* to the required list of regular or recent medications.

Beyond this comprehensive inquiry, Whirlpool required disclosure of 33 other topics. Although the vast majority of the inquiries relate to relatively specific medical issues, four inquiries were open ended:

***Are you under a doctor's care or being treated at the present time?***

***Have you left employment or the military due to medical reasons?***

***Taking any medications on a regular basis?***

***Any surgery or been hospitalized?***

The remaining 29 inquiries focused on specific diseases and/or conditions, such as epilepsy and chronic lower back pain. Although Mr. Miller believes that inquiry was improper for other reasons, plaintiff does not contest that some of the health conditions could affect the safe operation of a PIV, for example seizures, impaired vision,[5] fainting and missing or impaired hand, arm, foot, leg, toe, finger. Further, some of the conditions such as high blood pressure or heart disease, might possibly have an attenuated relationship to loss of consciousness and thus safe operation. Many, however, have no such relation. These include inquiries about allergies, skin disorders, use of tobacco (including tobacco use in the past), digestive problems, lung disease, sinus problems and depression.

Plaintiff's Interrogatory No. 4 asked Whirlpool to state whether it contended that each of the thirty-four (34) inquiries regarding health history on the Fitness-For-Duty questionnaire related to plaintiff's ability to safely drive a PIV and, if so, how it relates to the ability. Whirlpool stated in its response that it contended that ***all*** were so related, and went on to state its reasoning for each. Whirlpool's Response to Interrogatory No. 4.

Whirlpool's response to the first inquiry, "[a]ny illness, injury or past accidents?" sets the tone for the rest of its responses: "May reveal underlying medical condition or the taking of certain medications (*e.g.* sedating medications) that could impact a PIV driver's ability to drive PIV's in a safe manner." That is, disclosure of one condition could lead to the revealing of another condition which impacts the ability of a driver to operate a PIV.

The theory put forth in Whirlpool's Responses is that ***all*** medical conditions may be inquired about because they may lead to the discovery of another condition which might affect

[5] As noted, this was in addition to the vision check which Mr. Miller took and passed.

safe operation. So, for example, Whirlpool claims that skin disorders might manifest in rashes and hives, which might in turn reveal the underlying condition of lupus. Whirlpool claims concern that allergies may manifest themselves in adverse allergic reactions to environmental allergens to which PIV drivers may be exposed -- despite the fact that employees such as Mr. Miller had worked in this environment for years without difficulty. Shortness of breath may be indicative of heart disease, which in turn may be indicative of a “prior history of incapacitation.” Digestive problems may lead to a “history of ulcers.”

Many of these indirect “underlying conditions” are already been inquired about directly. Whirlpool’s omnipresent concern is about sedating medication. Whirlpool had, of course, already indirectly asked about sedating medications -- employees are required to reveal ***all*** medications they are taking (including over-the-counter medications), and to disclose narcotic or habit forming drug use. Whirlpool’s concern about smoking is that it might lead a history of incapacity due to asthma, although it had already asked if the employee suffers from asthma or shortness of breath.

In any event, Whirlpool’s position is that it is not only allowed to inquire about medical conditions and medications which might directly affect safety, it is allowed to inquire about ***all*** medical conditions and medication because they might ***lead*** to the discovery of a condition that affects safety. A need for safe operation of a golf cart allows an unlimited inquiry -- an employee’s entire medical history must be laid bare.

## IV. ARGUMENT

Whirlpool’s inquiries were so broad that the existence, nature, and severity of an employee’s disability would unavoidably be disclosed. The seminal authority on 42 U.S.C. §12112(d)(4)(A) is *Conroy v. New York State Dep't of Correctional Services*, 333 F.3d 88 (2nd

Cir. 2003), and the Sixth Circuit just reaffirmed pertinent portions and the rationale of *Conroy* in *Lee v. City of Columbus*, No. 09-3899 (6th Cir. 2011) (attached hereto).

Both *Lee* and *Conroy* involved a focused, individualized inquiry based on sick leave taken by the employee. Whirlpool's blunderbuss inquiries were not so tailored, and *Lee*'s analysis of *Conroy* is especially persuasive at bar.

### A. The ADA Prohibits Inquiries Regardless of the Employee's Actual or Perceived Disability.

*Lee* held that "[a] plaintiff need not prove that he or she has a disability in order to contest an allegedly improper medical inquiry under 42 U.S.C. §12112(d)." *Slip Op.* at 10 (citing and quoting *Conroy*, 333 F.3d at 94: "[A] plaintiff need not prove that he or she has a disability unknown to his or her employer in order to challenge a medical inquiry or examination under 42 U.S.C. §12112(d)(4)(a).").

*Lee* also approvingly cited and quoted *Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1214 (11th Cir.2010): "[A] plaintiff has a private right of action under [42 U.S.C. §12112(d)], irrespective of his disability status." *Slip Op.* at 10 (also citing and quoting *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007)). The reasoning of *Roe v. Cheyenne Mountain Conf. Resort, Inc.*, 124 F.3d 1221, 1229 (10th Cir. 1997) (citation and quotation marks omitted), convinced the Sixth Circuit: "It makes little sense to require an employee to demonstrate that he has a disability to prevent his employer from inquiring as to whether or not he has a disability." *Lee*, *Slip Op.* at 10.

### B. To Comply with the ADA Inquiries Must Be Job-Related and Justified by Business Necessity.

The ADA, 42 U.S.C. §12112(d), mandates that Whirlpool "shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or

severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."

While an employer "may make inquiries into the ability of an employee to perform job-related functions," 29 C.F.R. §1630.14(c), those inquiries focus on performance, not general health. At the heart of the ADA is an employer's stereotypical assumption that a disability adversely affects job performance.

"[T]he ADA limits an employer's ability to request unfounded examinations to prevent the unwanted exposure of the employee's disability and stigma it may carry[.]" *Sullivan v. River Valley School Dist.*, 197 F.3d 804, 812 (6th Cir. 1999) (citation and internal quotation marks omitted). *See also Lee, Slip Op.* at 7-8 n. 6 (approving citing and quoting *Sullivan*); *Farmiloe v. Ford Motor Co.*, 277 F.Supp.2d 778, 782 (N.D.Ohio 2002).

Ultimately, the ADA was enacted to "remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to persons without disabilities." 29 C.F.R. pt. 1630, App. One barrier was the way information about health was misused in the workplace as the basis for unfounded assumptions about the ability to perform. Unless an employer needed to know such information, therefore, it was legislated off limits. This prophylactic approach protected employers as well: if they did not know about a disability, they could not discriminate because of that disability.

Rather than a flat ban, though, the ADA enacted an exception to the rule that inquiries are not permitted. Whirlpool's questionnaire demonstrates how an exception can be used to swallow a rule.

"The statute clearly permits medical examinations but only in certain limited circumstances. The focus is on the nature of job relatedness and what constitutes a business

necessity." *EEOC v. Prevo's Family Market, Inc.*, 135 F.3d 1089, 1094 (6th Cir. 1998). To comply with the ADA, inquiries about the ability to perform must, therefore, be narrow and avoid the prohibited inference that employees who suffer from "x" are unable to perform.

The context in *Lee* and *Conroy* was return from sick leave, and the employers needed to curb any sick leave abuse and ensure no lingering health threats to performance. Under the EEOC interpretive appendix to its regulations, the ADA "permits employers to make inquiries or require medical examinations (fitness for duty exams) when there is a need to determine whether an employee is still able to perform the essential functions of his or her job." 29 C.F.R. Pt. 1630, App. §1630.14(c).

Mr. Miller and the other employees required to answer Whirlpool's broad questionnaire had not returned from sick leave and presented no other individualized suspicion of health conflicts with job performance. In the Sixth Circuit, "for an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Sullivan*, 197 F.3d at 811. Moreover, "any examination ordered by the employer must be restricted to discovering whether the employee can continue to fulfill the essential functions of the job." *Id*, at 812.

These standards are intrinsically individualized, while Whirlpool's mass questionnaire was not. The contexts in which inquiries have been permitted reflect individualized suspicion "An employer's request for a medical examination is job-related and consistent with business necessity when: (1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others." *Denman v. Davey Tree Expert Co.*, 266 Fed.Appx. 377, 379 (6th Cir. 2007).

An employee's request for an accommodation triggers an interactive dialogue during

which more information about the employee's disability is essential. *See Kennedy v. Superior Printing Co.*, 215 F.3d 650, 656 (6th Cir.2000) ("The ADA 'permits employers ... to make inquiries or require medical examinations necessary to the reasonable accommodation process....'") (quoting 29 C.F.R. §1630.14(c)). The sword/shield dichotomy illustrates the point. An employee may not ask for an accommodation and then clam up about his or her underlying need. "[T]he employer need not take the employee's word for it that the employee has an illness that may require special accommodation." *Prevo's Family Market, Inc.*, 135 F.3d at 1094.

An impact on job performance is illustrated by the facts in *Denman*, where the employee missed work for two weeks or so and "[u]pon his return to work, he provided Davey Tree information about bipolar disorder." 266 Fed.Appx. at 380. The employer could reasonably believe that his performance would be affected since his bipolar disorder "had just cause him to miss work. *Id.*

A direct threat is illustrated by the rest of the opinion in *Prevo's Family Market, Inc.* at 1103, which reasoned that an employer had to pursue information in response to an employee's disclosure that he was HIV positive, as the employee's essential job duties included using knives and routinely being cut. An individualized suspicion based on the employee's disclosure, rather than an assumption that any employee who used knives had to answer inquiries about contagious diseases, justified the inquiry.

At bar, Mr. Miller never even hinted to Whirlpool that he had a health problem with operating powered industrial vehicles, nor ever sought any accommodation. Whirlpool's Catch-22 reasoning is untenable. Whirlpool is saying to Mr. Miller, "You don't have to answer the questionnaire unless you refuse to answer the questionnaire and then you must answer."

Whirlpool's individualized suspicion to justify a broad questionnaire must exist ***before***

requiring employees to answer and may not be anchored ***afterwards*** in an employee's refusal. By analogy, a search challenged under the Fourth Amendment must be "justified at its inception." *Terry v. Ohio*, 392 U.S. 1, 20 (1968). Hindsight based on what was found or not found is not the measure. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 396 (1989) ("perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight").

### 1. <u>Whirlpool's Questionnaire Constituted an ADA Inquiry.</u>

In *Lee*, employees were required "to submit a copy of their physician's note, stating the 'nature of the illness' and whether the employee is capable of returning to regular duty, 'to your immediate supervisor.'" *Id.* at 4. The Sixth Circuit found that the nature of an illness was not "tantamount to an inquiry" under the ADA because "any routine or general inquiry" had too slight a tendency to reveal an employee's disability. *Slip Op.* at 13. *Lee* distinguished *Conroy*, noting that *Conroy* "unnecessarily swept within the statute's prohibition numerous legitimate and innocuous inquiries that are not aimed at identifying a disability." *Id.*

*Lee* emphatically contrasted, however, the very type of questionnaire Whirlpool required Mr. Miller to answer. "Obviously, asking an employee whether he is taking prescription drugs or medication, *see Doe [v. U.S. Postal Service*, 317 F.3d 339, 358-59 (D.C.Cir. 2003)], or questions 'seek[ing] information about illnesses, mental conditions, or other impairments [an employee] has or had in the past[,]' trigger the ADA's (and hence the Rehabilitation Act's) protections. *Scott [v. Napolitano*, 717 F.Supp.2d 1071, 1084-85 (S.D.Cal. 2010)]." *Lee*, *Slip Op.* at 13. *Accord Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1231 (10th Cir. 1997) ("The district court concluded that the prescription drug disclosure provisions of the Policy violated the ADA, and we agree."),

Thus, what was an ***obvious*** violation in *Lee* is the blatant violation at bar. *Lee*'s

distinction of *Conroy* establishes why *Conroy* applies at bar. *Lee* found "particularly problematic" reliance on *Conroy* in a Rehabilitation Act case. *Slip Op.* at 13. Mr. Miller's claims are brought under the ADA. Under the Rehabilitation Act, "[t]he mere fact that an employer, pursuant to a sick leave policy, requests a general diagnosis that *may tend to lead* to information about disabilities falls far short of the requisite proof that the employer is discriminating *solely* on the basis of disability." *Id.*.

*Lee*, *Slip Op.* at 14, explained that *Conroy* "appropriately, did not factor that [sole reason] requirement into its decision" while "[t]he Rehabilitation Act, in contrast, requires that plaintiffs make exactly that showing." The standard for the ***Rehabilitation Act*** is "whether a medical inquiry is intended to reveal or necessitates revealing a disability, rather than whether the inquiry may merely *tend to* reveal a disability." *Id*.

Whirlpool's questionnaire would fail even that stricter Rehabilitation Act standard and certainly flunks the ADA standard. The subjects did not ***merely*** tend to reveal a disability.

### 2. Job-Relatedness Is Proven by a Direct Connection, Rather than an Attenuated Link, to Essential Functions.

To carry its burden of proving job-relatedness, Whirlpool hypothecates that ***all*** health conditions and medications can be linked in some attenuated way to safe operation of a powered industrial vehicle. Whirlpool would reason that a nervous condition could make an employee excessively perspire, which could lead to sweaty palms, and from there to a lost grip on the wheel, and then an accident.

With logic like that, Whirlpool reads out of the ADA the job-relatedness element. Everything could be reasoned to be related -- however indirectly and distantly -- to the performance of essential functions. Faced with a comparably tenuous interpretation of relationship, the Supreme Court in *New York State Conference of Blue Cross & Blue Shield*

*Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655 (1995), explained:

> If "relate to" were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for "[r]eally, universally, relations stop nowhere," H. James, Roderick Hudson xli (New York ed., World's Classics 1980). ***But that, of course, would be to read Congress's words of limitation as mere sham***[.]

In the ADA precedent analyzed above, the job-relatedness was direct and immediate and did not risk reaching "the furthest stretch of its indeterminacy."

For example, in *Denman*, 266 Fed.Appx. at 380, the employee's bipolar disorder had already caused him to miss work and he had once before been discharged for absenteeism. "Moreover, Davey Tree's requests for medical information and later an IME were ***directly related and limited*** to Denman's ability to perform his essential job functions[.]" *Id.* (employer provided job description to employee's doctor) (emphasis noted).

Under *Lee*, inquiries after sick leave exemplify job-relatedness as long as the employer has a practice and policy of doing so. The individualized suspicion generated by an employee's use of sick leave differs dramatically from a laundry list of inquiries that do not focus on an individual employee and instead go on a fishing expedition for any condition or medication, no matter how attenuated. Just as the contexts of requesting a reasonable accommodation or posing a direct threat, an employee's absence due to illness raises a concern about ability to perform the job (or abuse of sick leave).

For "job-related" to serve as "words of limitation," Whirlpool's attenuated reasoning must be rejected.

### 3. Business Necessity Is Demonstrated Only When an Employer Uses Narrowly Tailored Inquiries.

"To demonstrate compliance with §12112(d)(4)(A), the employer bears the burden to

show the asserted 'business necessity' is vital to the business and the request for a medical examination or inquiry is no broader or more intrusive than necessary." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). *Accord Conroy*, 333 F.3d at 98 (The employer must then show that "the examination or inquiry genuinely serves the asserted business necessity and that the request is no broader or more intrusive than necessary.").

The critical difference between business necessity and a reasonable means is that business necessity requires the employer to use the narrower means. *See, e.g.*, *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 243 (2005) ("Unlike the business necessity test, which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the reasonableness inquiry includes no such requirement."). Necessity does not require the complete absence of alternatives, but overbroad means are unacceptable. *Conroy*, 333 F.3d at 98 ("The employer need not show that the examination or inquiry is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving the employer's goal.").

Specifically, "[t]he business necessity standard is quite high[] and is not [to be] confused with mere expediency." *Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001). "Business convenience" is certainly insufficient. *El v. S.E. Pa. Transp. Auth.*, 479 F.3d 232, 242 (3rd Cir. 2007).

The parallel ADA provision on medical examinations uses both job-related and business necessity, and *Hamer v. City of Atlanta*, 872 F.2d 1521, 1535 (11th Cir. 1989), explained that "[j]ob[-]relatedness is used in analyzing the questions or subject matter contained in a test or criteria used by an employer in making hiring or promotional decisions," while business necessity "is larger in scope and analyzes whether there is a business reason that makes

necessary the use by an employer of a test or criteria in hiring or promotional decision making." Whirlpool's overbreadth dooms any effort to carry its burden of demonstrating that necessity at bar.

In *Scott*, 717 F.Supp.2d at 1084, which *Lee* cited approvingly, comparable overbreadth precluded satisfaction of the ADA standard: "the questions were disability-related inquiries that were not narrowly tailored to assessing whether Plaintiff could perform the essential functions of his job." *Scott* involved some questions that were nearly identical to those raised by Whirlpool. *Scott* recognized that "[a]ll of the questions broadly seek information about illnesses, mental conditions, or other impairments Plaintiff has or had in the past." Of critical importance, "[t]he questions were not narrowly tailored to address Plaintiff's current ability to work." *Id.*

Timing was one feature: the questions could elicit information from before the employee had even started work. Scope was another: the questions could reach "for example, a past episode of appendicitis or a bad bout of eczema." *Id.* Undue intrusiveness another: "The sixth question, which asks about all types of drugs, including prescription and non-prescription, is intrusive and not tailored to determining whether an employee is using a drug that may affect his ability to do his job." *Id.* at 1085 (footnote omitted). Just as Whirlpool's inquiry, "[I]n answering this question, a person would have to reveal whether they were taking *any* medication, including Advil, birth control, or Viagra." *Id*,

*Scott* reached the same unavoidable conclusion as this Court should. "Given the scope of these questions, Defendant cannot satisfy its burden of establishing that the inquiries were 'no broader or more intrusive than necessary' to accomplish its goal of ensuring that Plaintiff could still safely do his job." *Id.* (citing EEOC Compliance Manual, 902:0187-88, distinction between asking about medications that may affect the ability to perform essential functions and asking for

all medications).

*Scott* emphasized that employers are permitted to ask job-related questions that are consistent with business necessity and stressed that its "holding is limited to the questions on the medical exam form and the questions posed by [staff], which were overbroad in scope and in time." *Id.* at 1085-86. Mr. Miller was ready, willing, and able to answer a narrowly drawn questionnaire, just as he immediately submitted to a vision test and accepted evaluations of his job performance which included how he operated an Electric Cart.

A claim by Whirlpool that OSHA approved its questionnaire does not excuse the ADA violation. In *Rohr v. Salt River Project Agricultural Imp. and Power Dist.*, 555 F.3d 850, 862 (9th Cir. 2009), the employer claimed that a "respirator certification test, including the breathilator test, was a business necessity because it is mandated by OSHA." The Court rejected that claim because "OSHA's requirements are not so specific." *Id.*

OSHA mandated that employees be evaluated on use of respirators, but "OSHA's regulations do not specify the content of such medical evaluations, how often the evaluations should be conducted, the appropriate tests for determining whether an employee should be certified, or any blood-pressure requirements." *Id.* at 862-63. Rather than "a case where an employer merely implemented the medical certification program required by a federal agency[,]" the case was one where "OSHA's regulations were sufficiently broad to allow Salt River the discretion to determine how, and how often, it would evaluate its employees' ability to use a respirator." *Id.* at 863.

*EEOC v. Murray, Inc.*, 175 F.Supp.2d 1053, 1066 (M.D.Tenn. 2001), considered the defense of complying with federal regulations. 29 C.F.R. §1630.15(e) ("It may be a defense to a charge of discrimination under this part that a challenged action is required or necessitated by

another Federal law or regulation, or that another Federal law or regulation prohibits an action . . . that would otherwise be required by this part."). "The admittedly few courts that have considered this provision have accepted it as a complete defense to an ADA claim, as long as the defendant could show that the action was, in fact, required by another Federal law." *Id.* at 1066.

Whirlpool will not be able to make that showing: OSHA did not require it to administer an overbroad questionnaire, nor did OSHA consider the ADA's dual requirements of job-relatedness and business necessity and then absolve Whirlpool of its ADA obligations. Indeed, OSHA lacks expertise in construing and applying the ADA, powers allocated to the EEOC.

In *Murray, Inc.*, 175 F.Supp.2d at 1066, the employer relied on the General Duty Clause of OSHA, 29 U.S.C. §654(a)(1), to justify its decision that "the operation of forklifts in this particular plant by persons with specific medical conditions, such as insulin-dependent diabetes, posed a hazard likely to cause death or serious physical harm to its employees." In turn, that decision would have justified inquiries: "The only way successfully to eradicate this recognized hazard was to conduct medical inquiries of all current and potential forklift operators to determine if they had the hazard-posing conditions." *Id.*

The Court agreed that OSHA's General Duty Clause did not require so broad a preclusion and could not, therefore, justify the inquires. *Id.* at 1066-67 ("[I]n order to rely on a *per se* exclusion of all individuals with certain medical conditions, the defendant must show that the condition necessarily results in a specific limitation that would preclude all individuals with the condition from being able to operate a forklift safely."). The inquiries could not, therefore, be excused by the employer claiming that OSHA made it pose them.

OSHA ***approval*** of a questionnaire does not satisfy the ADA regulatory standard of "required or necessitated." Had the regulation deemed mere acquiescence by another federal

agency as grounds for flouting a ***statutory*** requirement, it would have said so and then been subject to dismissal as unenforceable. OSHA's approval of a questionnaire that violates the ADA does not establish a business necessity.

## V. CONCLUSION

Whirlpool lacks any cognizable defense for its overbroad questionnaire. Precedent and analysis compel the conclusion that Whirlpool went far too far in posing its inquiries and flouted the ADA. Partial summary judgment should, therefore, be granted.

Respectfully submitted,

By*/s/ Edward R. Forman*
John S. Marshall (0015160)
(*jmarshall@marshallandmorrow.com*)
Edward R. Forman (0076651)
(*eforman@marshallandmorrow.com*)
MARSHALL AND MORROW LLC
111 West Rich Street, Suite 430
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

Attorneys for Plaintiff

**OF COUNSEL:**

Louis A. Jacobs (002101)
(*LAJOhio@aol.com*)
66871 Rayo del Sol
Desert Hot Springs, California, 92240-1871
(614) 203-1255
Fax (760) 288-2146

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing have been served on William Shin, Littler Mendelson, 321 North Clark Street, Suite 1000, Chicago, Illinois, 60654, and Michael W. Jackson, Anspach Meeks Ellenberger, LLP, 300 Madison Avenue, Suite 1600, Toledo, Ohio 43604 via the Court's ECF system this 5th day of May, 2011.

By /s/ *Edward R. Forman*
John S. Marshall (0015160)
(*jmarshall@marshallandmorrow.com*)
Edward R. Forman (0076651)
(*eforman@marshallandmorrow.com*)
MARSHALL AND MORROW LLC
111 West Rich Street, Suite 430
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

Attorneys for Plaintiff

**CERTIFICATE OF TRACK AND PAGE LIMITATIONS**

This is to certify that this case is assigned to the standard track, and that the Memorandum portion of this filing, exclusive of Certificates and Tables, does not exceed 20 pages.

By */s/ Edward R. Forman*
Edward R. Forman (0076651)