**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **ROGER W. MILLER,** | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION NO. 3:10 cv 00473** |
| **v.** | ) | **Judge James G. Carr** |
| **WHIRLPOOL CORPORATION,** | ) | |
| **Defendant.** | ) | |

---

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

PAGE

I. INTRODUCTION .......... 1

II. STATEMENT OF FACTS .......... 3

A. Plaintiff's Employment at the Clyde Division .......... 3

B. The Certification Process for PIV Drivers .......... 3

C. The Medical Reasoning Behind the Questionnaire's Inquiries .......... 5

III. LEGAL ANALYSIS .......... 6

A. Summary Judgment Standard .......... 6

B. Whirlpool's Questionnaire Does Not Violate the ADA .......... 7

1. The Questionnaire Applies To All PIV-Driving Employees, Disabled Or Not .......... 7

2. The Questionnaire Is Job-Related And Consistent With Business Necessity .......... 8

3. Whirlpool's Compliance With OSHA Is A Complete Defense .......... 11

C. Plaintiff's Arguments Miss The Mark .......... 14

1. There Is No "Individualized Suspicion" Requirement For Generally Applicable Certifications .......... 14

2. Scott v. Napolitano Is Distinguishable And, In Any Event, Is Not Controlling Precedent .......... 16

D. Plaintiff's Summary Judgment Motion Cannot Prevail .......... 17

IV. CONCLUSION .......... 18

**TABLE OF AUTHORITIES**

**PAGE**

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) .......... 7

*Bates v. Dura Automotive Systems, Inc.*, 650 F. Supp. 2d 754, 770 (M.D. Tenn. Apr. 23, 2009) .......... 9, 11

*Bates v. Dura Auto. Sys., Inc.*, 625 F.3d 283, 286 (6th Cir. 2010) .......... 11

*Bower v. Federal Express Corp.*, 156 F. Supp. 2d 678, 686 (W.D. Tenn. 2001) .......... 12

*Campbell v. Federal Express Corp.*, 918 F. Supp. 912, 917 (D. Md. 1996) .......... 12

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) .......... 6, 7

*Conroy v. New York State Dept. of Correctional Servs.*, 333 F.3d 88, 97 (2d Cir. 2003) .......... 8, 9, 11, 17

*Denman v. Davey Tree Expert Co.*, 266 Fed. App'x 377 (6th Cir. 2007) .......... 15

*EEOC v. J.B. Hunt Transp., Inc.*, 128 F. Supp. 2d 117, 131 (N.D.N.Y. 2001) .......... 15

*EEOC v. Murray, Inc.*, 175 F. Supp. 2d 1053 (M.D. Tenn. 2001) .......... 13, 17

*EEOC v. Prevo's Family Market*, Inc., 135 F.3d 1089 (6th Cir. 1998) .......... 15

*El v. SEPTA*, 479 F.3d 232, 242, 245 (3d Cir. 2007) .......... 9, 18

*Garcia v. Whirlpool Corp.*, Case No. 3:08-CV-02944, 2010 U.S. Dist. LEXIS 118409 (N.D. Ohio Nov. 5, 2010) .......... 7

*Kirkish v. Mesa Imports, Inc.*, No. CV-08-1965-PHX-NVW, 2010 U.S. Dist LEXIS 8060, at *16 (D. Ariz. Feb. 1, 2010) .......... 11, 15

*Lee v. City of Columbus*, 636 F.3d 245, (6th Cir. 2011) .......... 7, 8, 18

*Matricardi v. Astro Shapes, Inc.*, Case No. 4:04 CV 1317, 2007 U.S. Dist. LEXIS 75468 (N.D. Ohio Sep. 29, 2007) .......... 7

*Pollard v. Alsco, Inc.*, Case No. 1:09-cv-873, 2011 U.S. Dist. LEXIS 45367 (S.D. Ohio Apr. 27, 2011) .......... 7

*Rohr v. Salt River*, 555 F.3d 850 (9th Cir. 2009) .......... 12, 13, 17

*Scott v. Napolitano*, 717 F. Supp. 2d 1071 (S.D. Cal. 2010) .......... 16, 17

*Stokes v. Bridgestone Firestone N.A., LLC*, Case No. 5:08 CV 347, 2009 U.S. Dist. LEXIS 48226 (N.D. Ohio June 8, 2009) .......... 7

*Sullivan v. River Valley School District*, 197 F.3d 804, 812-13 (6th Cir. 1999) .......... 15

*Thoms v. ABF Freight Sys., Inc.*, 31 F. Supp. 2d 1119, 1127 (E.D. Wis.1998) .......... 12

*Wice v. General Motors Corp.*, Case No. 07 10662, 2008 U.S. Dist. LEXIS 106727 (E.D. Mich. Dec. 15, 2008) .......... 8, 9, 10, 11, 15, 17

*Wurzel v. Whirlpool Corp.*, Case No. 3:09-CV-498, 2010 U.S. Dist. LEXIS 36635, *23 (N.D. Ohio April 14, 2010) .......... 15

# TABLE OF AUTHORITIES
(CONTINUED)

PAGE

## STATUTES

29 U.S.C. § 654(a)(1) .......... 12
42 U.S.C. § 12112(b)(6) .......... 8
42 U.S.C. § 12112(d)(4)(A) .......... 7, 8

## REGULATIONS

29 C.F.R. § 1630.14(c) .......... 8
29 C.F.R. § 1630.15(e) .......... 11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **ROGER W. MILLER,** | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION NO. 3:10 cv 00473** |
| **v.** | ) | **Judge James G. Carr** |
| **WHIRLPOOL CORPORATION,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. INTRODUCTION

Defendant, Whirlpool Corporation ("Whirlpool" or "Company"), by its undersigned counsel and pursuant to Fed.R.Civ.P. 56, hereby moves for partial summary judgment and opposes the Motion for Partial Summary Judgment of Plaintiff, Roger Miller ("Plaintiff" or "Miller"), as follows.

In 2008, following an industrial accident and upon the Occupational Safety and Health Administration ("OSHA") determining that Whirlpool's then-existing certification process was insufficient, Whirlpool initiated a revised "Fitness for Duty" process to ensure that all drivers of Powered Industrial Vehicles ("PIVs") were physically able to drive them in a safe manner. One aspect of the process is a questionnaire (attached at Exhibit 1) that requests information considered by a medical doctor to be necessary to a determination of an individual's ability to safely drive a PIV. That questionnaire now lies at the heart of the parties' cross-motions for summary judgment. The questionnaire consists of thirty-four questions, and its completion is

required of all employees who drive PIVs as part of their job.

In a hearing before the Court on April 12, 2011, counsel for the Plaintiff took the position that no further discovery was necessary on the insular issue of the business necessity of the questionnaire. The Court agreed with Plaintiff's counsel that the parties should file cross-motions on that issue without further discovery. Thus, the crux of the issue now facing the Court is whether Whirlpool's questionnaire was lawful under the Americans With Disabilities Act ("ADA"). Plaintiff contends that it was not, despite acknowledging that "some of the health conditions [inquired in the questionnaire] could affect the safe operation of a PIV, for example seizures, impaired vision, fainting[,] missing or impaired hand, arm, foot, leg, toe, finger[,] . . . high blood pressure[,] heart disease [and] . . . loss of consciousness." (Ptf. Mtn., p. 7).

Whirlpool submits that the entire questionnaire was job-related and consistent with business necessity. First, while Plaintiff tries to downplay operation of a PIV by likening it to driving a golf cart, PIVs are driven in tight spaces, inside a loud factory, around fellow employees, and around potentially dangerous equipment and potentially harmful chemicals. Second, as reflected in the Declaration of Dr. Robert Marshall (attached as Exhibit 2), each of the medical inquiries and the answers thereto relate specifically to the determination of whether employees are capable of driving PIVs in a safe manner and what to do in case of injury. Third, Whirlpool does not automatically exclude employees from driving a PIV if they identify a certain medical condition in completing the questionnaire. Finally, Whirlpool created this questionnaire in response to workplace accidents and near-misses involving PIVs and to ensure compliance with OSHA.

For these reasons, Whirlpool respectfully requests that this Court grant its Motion for Partial Summary Judgment on this issue and correspondingly deny Plaintiff's Motion.

## II. STATEMENT OF FACTS

### A. Plaintiff's Employment at the Clyde Division

Plaintiff was a Toolmaker for Whirlpool in its Clyde Division between January 15, 2001 and February 15, 2009. (Ptf. Mtn., p. 2). During his employment with Whirlpool, Plaintiff repaired machinery and dies. (*Id.* at 3). Plaintiff's job required the regular use of PIVs to drive throughout the facilities of the Clyde Division. (*Id.*).

Whirlpool's Clyde Division is a manufacturing site with over 2,500 employees and 6 operating assembly lines, all of which include moving machinery. (*See* Declaration of Jennifer Lenhart, attached as Exhibit 3, at ¶ 2). The site is replete with numerous moving PIVs, including tow motors (forklifts), which may weigh 10,000 pounds and are in continuous motion. (*Id*. at ¶ 3). There is constant interface between employees who are walking through the site and those operating PIVs. (*Id*.). PIVs and pedestrians use the same passageways, and there is no physical barrier between them. (*Id*.). Rather, PIV lanes and pedestrian lanes are separated by painted lines. (*Id*.).

The machinery contained on site includes, but is not limited to, presses, drills, cutting machinery, and moving assembly lines, which carry large parts and products. (*Id*. at ¶ 4). All of the machines are automated and difficult to shut down. (*Id*.). Many of them move at a fast pace. (*Id*.). Due to the moving machinery and operating tow motors and forklifts, the noise level at the site is very high. (*Id*.). Accordingly, employees are required to wear earplugs at all times when walking through and working in the site. (*Id*.).

### B. The Certification Process for PIV Drivers

On June 4, 2008, there was an accident involving a PIV at Whirlpool's Clyde Division, the plant where Plaintiff worked. (Lenhart Decl., ¶ 5). Specifically, Whirlpool had brought in a contractor, GEM Industrial ("GEM"), to make equipment changes to one of Whirlpool's basket

fabrication lines. (*Id.*). The contractor was using a crane, and the crane tipped over. (*Id.*). After GEM learned of this accident, GEM indicated that the crane may "right itself" and flip to the other side thereby potentially causing further harm. (*Id.* at ¶ 6). As such, GEM requested that Whirlpool place a forklift behind the crane to stabilize the crane and ensure that the crane would not flip back up. (*Id.*). Whirlpool employee, Mark Shaver, operated the forklift and placed it behind the crane. (*Id.*).

On or about June 13, 2008, OSHA visited Whirlpool's Clyde facility as part of OSHA's investigation of GEM as a result of the accident involving the fallen crane. (*Id.* at ¶ 7). After OSHA learned that Mr. Shaver had operated the forklift to place behind the crane, OSHA also investigated whether Whirlpool had properly evaluated whether Mr. Shaver could operate the forklift safely. (*Id.*).

After Whirlpool informed OSHA of its then-existing certification process for PIV drivers, OSHA determined that the certification process was inadequate and that Whirlpool did not properly evaluate whether Mr. Shaver could operate a forklift safely. (*Id.* at ¶ 8). Accordingly, OSHA issued Whirlpool a citation on or about June 25, 2008. (*Id.*). To comply with OSHA and remedy the violation stated in OSHA's citation, Whirlpool created the current PIV certification process, including the questionnaire that Plaintiff refused to complete. (*Id.*). Whirlpool submitted the PIV certification process to OSHA, including the questionnaire, for OSHA's review. (*Id.* at ¶ 9). OSHA approved the certification process and, on that basis, found that Whirlpool had taken sufficient steps to comply with OSHA. (*Id.* at ¶ 10). OSHA's inspector, Wayne McMahon, specifically advised that Whirlpool's revised certification process was sound in ensuring that its PIV drivers could safely operate PIVs. (*Id.*).

The PIV Fitness-For-Duty Certification process is multi-faceted. PIV drivers take an eye

exam and a driving test. (*Id.* at ¶ 11). In addition, each PIV driver is given the questionnaire and is instructed to complete and return it to Whirlpool's Employee Heath Center ("EHC"), where it is evaluated by one of Whirlpool's medical professionals. (*Id.*). Notably, Whirlpool does not automatically exclude an employee from driving a PIV based upon a particular answer given in response to the questionnaire. (*Id.* at ¶ 12; Marshall Decl., ¶ 7) Rather, answers to the medical inquiries in the questionnaire are merely a means of beginning a dialogue between the employee and Dr. Marshall and/or Whirlpool's occupational health nurse to learn more about the employee's condition and its impact, if any, on the employee's ability to drive a PIV safely. (Marshall Decl., ¶ 8). Access to employees' completed questionnaires is restricted to EHC personnel. (Lenhart Decl., ¶ 13).

**C. The Medical Reasoning Behind the Questionnaire's Inquiries**

As attested to by Whirlpool's Medical Director, Dr. Robert Marshall, each part of the questionnaire is necessary to the determination of whether employees are capable of driving PIVs in a safe manner, how they might be accommodated in order to drive safely, and what to do in case the employee is injured or incapacitated in an accident. In these important respects, the questionnaire is tailored to promote the safety and well-being of Whirlpool's employees – its PIV drivers, as well as its non-PIV drivers who might be in close proximity.

An examination of each of the thirty-four inquiries is worthwhile, although Plaintiff does not challenge the medical inquiries relating to seizures, impaired vision, fainting[,] missing or impaired hand, arm, foot, leg, toe, finger[,] . . . high blood pressure[,] heart disease [and] . . . loss of consciousness." (Ptf. Mtn., p. 7). Attached hereto as Exhibit 2, Dr. Marshall's declaration provides some specific reasoning for each part of the questionnaire. The questionnaire is designed and tailored in such a way to enable the EHC to make a medical assessment of whether an employee is capable of driving a PIV in a safe manner. (Marshall

Decl. ¶ 4). The questionnaire also alerts the EHC to specific allergies and reactive medications that might cause trouble if a PIV driver is injured and must be treated. (Marshall Decl. ¶¶ 4, 12). The questionnaire also allows the EHC to determine whether any reasonable accommodation may allow a PIV driver to drive safely. (Marshall Decl. ¶ 4).

In Dr. Marshall's roughly thirty years of experience in this field, he has found that many individuals completing a questionnaire might not remember the medications they are taking, or may not realize that they are in fact suffering from a medical condition or side-effect that could impact their ability to perform their job in a safe manner. (Marshall Decl. ¶ 5). The thirty-four inquiries contained in Whirlpool's questionnaire enable the EHC to extract necessary health information from multiple angles to 1) diagnose medical conditions, which may be serious in nature and which the employee may not even be aware of having, 2) determine the medications, if any, that are being taken and any side-effects the employee might be experiencing, and 3) ultimately determine if the employee is medically fit to safely drive a PIV with or without a reasonable accommodation. (Marshall Decl. ¶ 5).

In these important respects, the questionnaire is tailored to promote the safety and well-being of Whirlpool's employees – its PIV drivers, as well as its non-PIV drivers who might be in close proximity. (Marshall Decl. ¶ 6). While Dr. Marshall's attached declaration does not provide *every* medical reason behind each of the questionnaire's inquiries, it demonstrates the necessity for these inquiries. (Marshall Decl. ¶ 9).

## III. LEGAL ANALYSIS

### A. Summary Judgment Standard

The summary judgment procedure provided for in Federal Rule of Civil Procedure 56(c) "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is

proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id*. at 322. To establish a genuine issue of material fact, Plaintiff cannot simply rest on his pleadings; rather, he must provide sufficient evidence such that a reasonable trier of fact could return a verdict for him. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986). Where, as here, Plaintiff fails to establish an issue of material fact, summary judgment is granted. *Pollard v. Alsco, Inc*., Case No. 1:09-cv-873, 2011 U.S. Dist. LEXIS 45367 (S.D. Ohio Apr. 27, 2011); *Garcia v. Whirlpool Corp*., Case No. 3:08-CV-02944, 2010 U.S. Dist. LEXIS 118409 (N.D. Ohio Nov. 5, 2010); *Stokes v. Bridgestone Firestone N.A., LLC*, Case No. 5:08 CV 347, 2009 U.S. Dist. LEXIS 48226 (N.D. Ohio June 8, 2009); *Matricardi v. Astro Shapes, Inc.*, Case No. 4:04 CV 1317, 2007 U.S. Dist. LEXIS 75468 (N.D. Ohio Sep. 29, 2007).

### B. Whirlpool's Questionnaire Does Not Violate the ADA

#### 1. The Questionnaire Applies To All PIV-Driving Employees, Disabled Or Not

In his brief, Plaintiff relies upon the recent decision of the Sixth Circuit in *Lee v. City of Columbus*, 636 F.3d 245 (6th Cir. 2011). However, Plaintiff's discussion of the case leaves out the most presently-applicable element of the *Lee* court's holding. The relevant policy in *Lee* required any employee using three days of sick leave (or two days of family medical leave) to provide a doctor's note containing the "nature of the illness [or family member's illness]." *Id*. at 247-48. Applying Section 12112(d)(4)(A) of the ADA, the Sixth Circuit held that, even if the policy "can be characterized as a disability-related inquiry, it is not prohibited by the ADA because it is a workplace policy applicable to all employees, disabled or not." *Id.* at 255. The Sixth Circuit went on to explain that the policy was "universal . . . applicable across the board to

all Division employees, disabled or not . . . Consistent with the above authorities, it constitutes a valid and acceptable inquiry under § 12112(d)(4)(A)." *Id*. at 257. The Sixth Circuit therefore vacated the order of the district court and remanded this case for entry of judgment in favor of the employer. *Id*.

The same result should be reached in the present case. As Plaintiff concedes, he was not the only employee required to complete the questionnaire. Rather, like the policy in *Lee*, the questionnaire was applicable to all drivers of PIVs, regardless of whether any particular PIV driver was disabled or showed any symptoms of a disability. As such, the questionnaire is a "valid and acceptable inquiry." *Id*.

### 2. The Questionnaire Is Job-Related And Consistent With Business Necessity

Additionally, the questionnaire is job-related and consistent with business necessity. The ADA provides that an employer may make any medical inquiries that are "job-related for the position in question and is consistent with the business necessity." 42 U.S.C. § 12112(d)(4)(A). The Act also allows an employer to impose a medical qualification standard that is "job-related for the position in question and is consistent with business necessity . . ." 42 U.S.C. § 12112(b)(6). Finally, the Act specifically allows employers to "make inquiries into the ability of an employee to perform job-related functions." 29 C.F.R. § 1630.14(c)

As discussed above, the purpose of Whirlpool's questionnaire is to ensure that employees are able to safely operate PIVs. It is well established that workplace safety is a business necessity. *See, e.g.*, *Conroy v. New York State Dept. of Correctional Servs*., 333 F.3d 88, 97 (2d Cir. 2003) (business necessity includes "ensuring that the workplace is safe and secure"); *Wice v. General Motors Corp.*, Case No. 07 10662, 2008 U.S. Dist. LEXIS 106727, at *7 (E.D. Mich. Dec. 15, 2008) ("screening employees for medical conditions that may interfere with their ability

to drive mobile equipment safely is a 'reasonably effective method' of achieving GM's goal of a safe workplace); *Bates v. Dura Automotive Systems, Inc*., 650 F. Supp. 2d 754, 770 (M.D. Tenn. Apr. 23, 2009) ("Dura's medical screening program is based on the sound goal of 'workplace safety'").

Thus, the question is whether Whirlpool's questionnaire inquiries are "consistent" with this business necessity – the safe operation of PIVs by those who use them in their work for Whirlpool. Plaintiff cites *Conroy*, 333 F.3d at 97-98, and *El v. SEPTA*, 479 F.3d 232, 242, 245 (3d Cir. 2007) both of which explore the "business necessity" standard before ruling in favor of the relevant defendants. The Second Circuit in *Conroy* explained that the policy must "genuinely serve the asserted business necessity," need not be "the only way of achieving a business necessity," and must be "a reasonably effective method of achieving the employer's goal." *Id.* The Third Circuit in *El* held that a policy "need not be perfectly tailored to be consistent with business necessity," and that a policy is consistent with business necessity so long as it enables an employer to distinguish between those "that do and do not pose an unacceptable level of risk." *El*, 479 F.3d at 242, 245. In the present case, as demonstrated by the declaration of Dr. Marshall, the questionnaire enables Whirlpool (upon any necessary follow-up after completion of the questionnaire) to distinguish between those who can, and cannot, safely operate a PIV.

The recent case of *Wice v. General Motors Corp.*, Case No. 07 10662, 2008 U.S. Dist. LEXIS 106727 (E.D. Mich. Dec. 15, 2008) is directly on point. In *Wice*, General Motors required all drivers of PIVs (described in *Wice* as "mobile equipment such as fork trucks, portable cranes, bulldozers, and scissor lifts") to undergo a medical examination of the employee's "vision, heart function, blood pressure, blood sugar, lung function, hearing, reflexes,

balance, and his overall general condition." *Id.* at *2. The examination in *Wice* also included a questionnaire that was broader in scope than the one in the present case. Both the General Motors and Whirlpool questionnaires consisted of 34 inquiries, and the General Motors questionnaire asked, *inter alia*:

> Have any blood relatives had diabetes [or heart trouble, stroke, high blood pressure, asthma, or allergies]?
>
> Do you have any allergies or a history of allergies?
>
> Are you in good health and without physical disability?
>
> Since your last GM Exam have you had any serious illness or injury [or hospitalizations or operations]?
>
> Do you take medication or treatment regularly?
>
> Do you have a history of heart or blood pressure trouble [or anemia, blood problems or blood disease]?
>
> Do you have a history of stomach or intestinal problems or ulcers?
>
> Since your last GM Exam, have you had a change in bowel habits, diarrhea, or blood in stool?
>
> Do you have a history of arthritis, rheumatism, or bursitis [or diabetes, excess thirst, cancer, tumor, or cyst]?
>
> Since your last GM Exam have you had any skin disorder or rashes?
>
> Do you have a history of ear, nose, throat, or sinus trouble?

*Wice v. General Motors Corp.*, Case No. 07-10662, Dkt #25-12. (General Motors questionnaire is attached hereto as Exhibit 4). As in the present case, the plaintiff in *Wice* refused to complete the questionnaire and engage in the examination and instead sued General Motors, claiming that the examination violated the ADA. *Wice*, 2008 U.S. Dist. LEXIS 106727, at *4-6.

Applying the business necessity analysis, the court in *Wice* granted summary judgment for General Motors. *Id.* at *9. The court explained that "ensuring a safe workplace is a business necessity." *Id.* at *7. The court noted that General Motors, like Whirlpool in the present case,

"does not automatically exclude employees from driving who have certain medical conditions, such as high blood pressure or diabetes." *Id.* at 8. Regarding the plaintiff's contention that such health conditions were only remotely connected to the ability to drive a PIV safely, the court explained:

> The court is persuaded, however, that screening employees for medical conditions that may interfere with their ability to drive mobile equipment safely is a "reasonably effective method" of achieving GM's goal of a safe workplace. Common sense suggests that GM should not have to wait for an accident to occur to justify screening employees.

*Id.* at *7-8 (quoting *Conroy*, 333 F.3d at 97-98). The *Wice* holding is directly applicable to the present case, and the same result – summary judgment on the employer's behalf – should prevail. Indeed, *Wice* has been widely cited with approval, including within the Sixth Circuit. *Bates v. Dura Auto. Sys., Inc.*, 625 F.3d 283, 286 (6th Cir. 2010); *Bates*, 650 F. Supp. 2d at 771 (describing *Wice* as "well-considered and soundly reasoned case law"); *Kirkish v. Mesa Imports, Inc.*, No. CV-08-1965-PHX-NVW, 2010 U.S. Dist LEXIS 8060, at *16 (D. Ariz. Feb. 1, 2010).

**3. Whirlpool's Compliance With OSHA Is A Complete Defense**

The regulations written for the ADA explain:

> (e) *Conflict with other Federal laws*. It may be a defense to a charge of discrimination under this part that a challenged action is required or necessitated by another Federal law or regulation, or that another Federal law or regulation prohibits an action (including the provision of a particular reasonable accommodation) that would otherwise be required by this part.

29 C.F.R. § 1630.15(e). More specifically, the EEOC's Enforcement Guidance explains: "An employer may make disability-related inquiries and require employees to submit to medical examinations that are mandated or necessitated by another federal law or regulation. . . Other federal laws that require medical examinations or medical inquiries of employees without violating the ADA include: the Occupational Safety and Health Act . . ." Indeed, the OSH Act requires, under its General Duty Clause, that each employer "shall furnish to each of his

employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1).

In the present case, it is undisputed that OSHA investigated an industrial accident involving a PIV at Whirlpool in June of 2008. OSHA's investigation indicated that Whirlpool's current methods of ensuring a PIV driver's ability to safely operate a PIV was insufficient. In order to comply with OSHA and remedy the violation stated in OSHA's citation, Whirlpool created the current PIV certification process, including the questionnaire challenged by Plaintiff. Indeed, Whirlpool submitted the certification process, including the questionnaire, to OSHA for review. OSHA approved the certification and, on that basis, found that Whirlpool had taken steps to comply with the OSH Act. Several courts have accepted that such compliance with federal law is a complete defense to an ADA claim. *See, e.g.*, *Bower v. Federal Express Corp.*, 156 F. Supp. 2d 678, 686 (W.D. Tenn. 2001); *Thoms v. ABF Freight Sys., Inc.*, 31 F. Supp. 2d 1119, 1127 (E.D. Wis.1998); *Campbell v. Federal Express Corp.*, 918 F. Supp. 912, 917 (D. Md. 1996).

Plaintiff's brief misconstrues this defense. First, Plaintiff cites *Rohr v. Salt River*, 555 F.3d 850 (9th Cir. 2009). In *Rohr*, the employer attempted to defend a breathilator test for respirator users as being required by OSHA regulations. The Ninth Circuit disagreed, specifically finding that "OSHA's regulations were sufficiently broad to allow Salt River the discretion to determine how, and how often, it would evaluate its employees' ability to use a respirator." *Id.* at 863. *Rohr* is clearly distinguishable. There was no evidence in *Rohr* that OSHA had accused the employer of failing to adequately certify respirator users following a respirator-related accident. Thus, there was no evidence that, in response to such an OSHA

accusation, the employer had submitted the breathilator test to OSHA and then adopted that test in order to comply with OSHA. Thus, the present case is very different from *Rohr*, and compels a different result.

Plaintiff's reliance on *EEOC v. Murray, Inc.*, 175 F. Supp. 2d 1053 (M.D. Tenn. 2001) is similarly misguided. The court in *Murray* held that the General Duty Clause did not require an employer to *per se* exclude employees with particular infirmities from driving fork trucks. *Id*. at 1066-67. Indeed, Whirlpool has no such policy. As explained above, employees answering "yes" on the questionnaire then follow-up with Whirlpool's safety and medical staff to determine whether the employee is still able to operate a PIV safely, with or without a reasonable accommodation. *Murray* did not hold that an *inquiry* into such infirmities was never justified by the General Duty Clause. While the Plaintiff would apparently have the Court conclude that the General Duty Clause requires no medical inquiries, the EEOC's Enforcement Guidance and OSHA's investigation of Whirlpool's PIV certification process show otherwise. Furthermore, like *Rohr*, the *Murray* case contained no evidence of any OSHA investigation, review, or approval of the relevant policy.

Furthermore, Whirlpool's post-OSHA-investigation approach to PIV certification is hardly novel. The American National Standards Institute (ANSI), the administrator and coordinator of the United States private sector voluntary standardization system for over 90 years, maintains safety standards for powered (and non-powered) industrial trucks (*i.e*. PIVs). (Exhibit 5). ANSI has maintained standards for industrial powered trucks since 1947. (Exhibit 5, at "Foreword," p. iv). Specifically, ANSI standard 4.18 requires that "operators of powered industrial trucks shall be qualified as to visual, auditory, physical and mental ability to operate the equipment safely." (*Id*. at pg. 6).

Perhaps most tellingly, OSHA's own Medical Examination Program, for OSHA's own employees, includes a mandatory medical questionnaire much broader than Whirlpool's. (Exhibit 6). As of 1999, all OSHA Inspectors must undergo a Periodic Physical Examination every three years until age 50, then at least every two years thereafter. (*Id.* at pg. "Abstract-3"). Part of that Examination is the completion of forms "OSHA 178" and "OSHA 179." (*Id.* at "Appendix G"). These OSHA questionnaires include some 80 inquiries into whether the employee has suffered medical conditions from urinary infection to venereal disease, and from eczema to "dental/gum problems (Specify)". *Id.* The questionnaire seeks family medical history in 16 categories, from cirrhosis to "other diseases not listed (please specify)." *Id.* This OSHA Periodic Physical Examination "is mandatory for all covered employees." (*Id.* at pg. "Abstract-3"). Indeed, it is no wonder that OSHA would require Whirlpool to adopt such a certification procedure for its drivers of PIVs. After all, OSHA explains that its own program is "based on a review of: current medical literature, professional guidance, medical examination protocols in other agencies and non-occupational medical public health recommendations." *Id.*

### C. Plaintiff's Arguments Miss The Mark

#### 1. There Is No "Individualized Suspicion" Requirement For Generally Applicable Certifications

Plaintiff claims that Whirlpool's questionnaire is unlawful because Whirlpool had no "individualized suspicion" that Plaintiff's ability to safely drive a PIV was hampered by any physical limitation, even going so far as to liken this supposed limitation to a Fourth Amendment search and seizure. In other words, Plaintiff argues that Whirlpool may not screen employees until they have shown themselves to be unsafe to drive – ostensibly by driving unsafely and putting themselves and other employees in harm's way. Fortunately, this argument for "trial by fire" has already failed in the courts. As this Court explained in a recent decision involving

Whirlpool and the ADA:

> Plaintiff's argument that a future occurrence was not likely because nothing had happened in the past is off point. Should the nearsighted drive without glasses because they have yet to run into something or somebody? An employer need not wait to respond to risk of harm until someone is hurt.

*Wurzel v. Whirlpool Corp.*, Case No. 3:09-CV-498, 2010 U.S. Dist. LEXIS 36635, *23 (N.D. Ohio April 14, 2010). As the *Wice* court similarly explained, "common sense suggests that GM should not have to wait for an accident to occur to justify screening employees." *Wice*, 2008 U.S. Dist. LEXIS 106727 at *7-8l; *Kirkish*, 2010 U.S. Dist LEXIS 8060, at *16 (same); *EEOC v. J.B. Hunt Transp., Inc.*, 128 F. Supp. 2d 117, 131 (N.D.N.Y. 2001) ("No one could seriously dispute" the job-relatedness of screening employees who will operate vehicles for medications which may impair their ability to drive).

Plaintiff has not cited any authority for the proposition that an employer may not apply a generally-applicable medical certification requirement for all employees in a context such as this. Rather, Plaintiff cites cases standing for the common sense proposition that an employer may not single out *an* employee for medical examinations without an individualized suspicion applicable to that employee. The cases cited merely stand for the limited proposition that, in the context of *individual* inquiries, the employer must have some prior individualized suspicion. *See Sullivan v. River Valley School District*, 197 F.3d 804, 812-13 (6th Cir. 1999) (mental screening of individual employee upheld since individual engaged in aberrant behavior); *Denman v. Davey Tree Expert Co.*, 266 Fed. App'x 377 (6th Cir. 2007) (employer's request that an individual employee provide medical information and submit to an independent medical examination was proper because employer knew that employee had bipolar disorder and employee had previously missed a significant amount of work); *EEOC v. Prevo's Family Market*, Inc., 135 F.3d 1089 (6th Cir. 1998) (employer's request that individual employee provide further medical examination

was proper because employee informed employer he had HIV).

Unlike the cases cited by Plaintiff, the present case involves a certification requirement applicable to all drivers of PIVs, not an individual request that Plaintiff be certified. Thus, no "individualized suspicion" was necessary.

#### 2. ***Scott v. Napolitano*** **Is Distinguishable And, In Any Event, Is Not Controlling Precedent**

Plaintiff relies heavily on *Scott v. Napolitano*, 717 F. Supp. 2d 1071 (S.D. Cal. 2010). In *Scott*, the plaintiff informed his employer of tendonitis in his arm and shoulder, and his employer removed his law-enforcement status until he successfully passed a fit-for-duty physical examination. *Id.* at 1077. After removing his law-enforcement status, the employer sent Scott two questionnaires, asking him to answer various medical questions (many of which had nothing to do with his arms or shoulders) and release his complete medical records. *Id.* at 1078. Scott's erratic response to these requests then prompted his employer to also ask him to undergo a psychiatric evaluation. Scott continued to refuse the employer's requests, and he was eventually terminated. *Id.* at 1081.

The court held that the questionnaire contained disability-related inquiries that were not narrowly tailored to address Scott's current ability to work. *Id.* at 1084. Key to the court's holding was the fact that the questionnaire and physical examination were not limited in scope to the arm and shoulder issues Scott had identified. Indeed, the court even made clear that "a properly tailored mental examination may have been permissible if Defendant had a reasonable concern about [Scott's] mental health." *Id.* at 1085. However, the defendant's own actions foreclosed the reasonableness of such a concern, as it had not previously required Scott to submit to a mental exam upon returning from leave for mental health issues, had cancelled another mental exam, and had not otherwise pursued such an exam prior to Scott's complaint regarding

his arm and shoulder. *Id*

The text of the *Scott* decision limits its own holding:

> The Court's holding is limited to the questions on the medical exam form and the questions posed by Ms. Hirano, which were overbroad in scope and in time. These disability-related inquiries were not narrowly tailored to evaluate whether Plaintiff could perform the essential functions of the job.

*Id.* In fact, the present case stands in stark contrast to *Scott.* Plaintiff did not complain of an injury to his foot (for example) which precipitated a wide-ranging Whirlpool investigation of his entire health history (including his mental health history). That kind of overbearing, individual response would run afoul of the ADA's prohibition, as described in *Wice*, of: "making employment decisions based upon generalized assumptions about physical and mental impairments without determining the individual capabilities of each employee with the specific impairment." *Wice*, 2008 U.S. Dist. LEXIS 106727, at *8-9.

The present case does not involve an individual investigation of Plaintiff's medical and mental health history as was present in *Scott*. Rather, Whirlpool initiated a certification requirement for *all* drivers of PIVs – the same action, including a very similar questionnaire, approved by the court in *Wice*.

**D. Plaintiff's Summary Judgment Motion Cannot Prevail**

In the event that Whirlpool's motion is denied, there can be no doubt that Plaintiff has failed to meet his own summary judgment burden. Plaintiff has failed to cite any comparable case in which summary judgment was granted to a plaintiff: *Conroy*, 333 F.3d at 88 (reversing grant of summary judgment to plaintiff, finding questions of fact on business necessity); *Rohr*, 555 F.3d at 850 (issues of fact precluded summary judgment on business necessity); *Murray*, 175 F. Supp. 2d at 1053 (same). Quite the contrary, much of the relevant case law enters judgment in the defendant's favor: *See, e.g.*, *Wice*, 2008 U.S. Dist. LEXIS 106727, at *8 (summary judgment

for employer in case directly on point); *Lee*, 636 F.3d at 245 (reversed and remanded for entry of judgment in favor of the employer); *El*, 479 F.3d at 232 (affirming summary judgment for employer on business necessity).[1]

Given the facts and arguments above, it is Whirlpool, not Miller, that has met the summary judgment burden.

## IV. CONCLUSION

For the foregoing reasons, Whirlpool respectfully requests that this Court grant this Motion for Partial Summary Judgment and correspondingly deny Plaintiff's Motion for Partial Summary Judgment.

Dated: May 27, 2011

Respectfully submitted,

WHIRLPOOL CORPORATION

By: /s/*David L. Christlieb*
One of Its Attorneys

Michael W. Jackson (0076344)
ANSPACH MEEKS ELLENBERGER LLP
300 Madison Avenue, Suite 1600
Toledo, OH 43604
Telephone: 419.246.5757; Facsimile: 419.321.6979
Email: mjackson@anspachlaw.com

Adam C. Wit (Admitted *Pro hac vice*)
David L. Christlieb (Admitted *Pro hac vice*)
William J. Shin
LITTLER MENDELSON, P.C.
321 North Clark Street, Suite 1000
Chicago, IL 60654
Telephone: 312.372.5520; Facsimile: 312.372.7880
Email: awit@littler.com
dchristlieb@littler.com
wshin@littler.com
*Attorneys for Whirlpool Corporation*
Dated: May 27, 2011

[1] The unreported cases cited herein are collectively attached as Exhibit 7.

## CERTIFICATE OF SERVICE

David L. Christlieb hereby certifies that on May 27, 2011, the foregoing was filed electronically. Notice of this filing will be sent to the parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

By: /s/*David L. Christlieb*
David L. Christlieb

## CERTIFICATE OF TRACK AND PAGE LIMITATION

David L. Christlieb hereby certifies that this case is assigned to the standard track, and that the Memorandum portion of this filing, exclusive of Certificates and Tables, does not exceed 20 pages.

By: /s/*David L. Christlieb*
David L. Christlieb